FILED

2003 OCT 16  A 11: 40

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 3:01CV-1086(SRU) |
| Plaintiff | |
| v. | |
| ONE PARCEL OF PROPERTY LOCATED AT 27 LINCOLN AVENUE, NORWALK, CONNECTICUT, WITH ALL APPURTENANCES AND IMPROVEMENTS THEREON, | October 16, 2003 |
| Defendants. | |
| [CLAIMANT: ALQUEEN BURDEN]. | |

---

## MOTION FOR PROTECTIVE ORDER

Claimant Alqueen Burden respectfully moves the court, pursuant to FRCP §26(c), to issue a protective order prohibiting the Plaintiff United States of America from utilizing criminal investigative agencies for the interview of witnesses identified by the claimant as witnesses for the claimant.

On October 1, 2003, Claimant Alqueen Burden, by and through undersigned counsel, appeared in this court, notifying it of her intention, in the delivery of discovery responses, to withhold the names of witnesses until this court has ruled on this motion. The court acknowledged Claimant Burden's position, instructing undersigned counsel to identify the witnesses in her discovery responses, at the same time requiring that the

government not permit any law enforcement agencies to contact said witnesses until this court has ruled on this motion. On October 3, 2003, as ordered, claimant Alqueen Burden identified the witnesses whose names were responsive to the discovery requests. Presented below are the Claimant Burden's arguments in support of the motion.

### ARGUMENT

As undersigned counsel indicated in court on October 1, 2003, Claimant Burden's claim is this. The government, having the most powerful criminal investigative agencies in the world at its disposal for the interview and investigation of potential witnesses, is afforded an unfair and unsupportable advantage in matters pending before the court. No party litigant standing before the court, with the exception of the government, is permitted to work up a case relying upon officers equipped with guns, badges, handcuffs, lockups, rapsheets and virtually unlimited budgets, enjoying the unique, exclusive authority to arrest and charge people with serious crimes, take them away in police vehicles, and hold them in prison until the time comes to be brought before a court, placing them in a position of needing to hire, or otherwise rely upon counsel.

It is a matter of inconvenience, sometimes a great inconvenience, for the average citizen to be called upon to report their observations in a pending court matter. But for witnesses involving litigants other than the government, it involves little more than inconvenience. They expect to give statements and testimony. They do not expect their lives to be turned upside down by world-class criminal investigators, for the purpose of determining whether they have done, or failed to do, anything that might expose them to criminal liability.

When the government is a litigant, however, it is a very different matter. When the FBI, DEA, ATF, state police, local police, or just about anyone else with authority to

-2-

arrest show up at a witness' door, that witness has a great deal more to fear than it would if a private investigator arrived to inquire about the matter, or to serve a deposition subpoena. The government often argues that people who live law-abiding lives have nothing to fear. Litigants, however, should not have their cases rise and fall on whether the witnesses who happened to observe the relevant events have or have not lived law-abiding lives. Indeed, most people would claim the Zoe Baird lived a law-abiding life. Now, however, one wonders how many law-abiding people who have, inadvertently, failed to properly handle the reporting of domestic employment, after seeing what Ms. Baird went through, would fear that maybe they have committed tax fraud? Agents will say that when witnesses are visited, no threats are made. The most well-intentioned agents, however, overlook the terror which a great many people experience when the FBI comes knocking. No person is perfectly without the concern that maybe an entry on a tax return that was more aggressive than the norm, may ripen into a charge. Moreover, as is the case in any profession, dishonest, rogue agents and officers do exist. It takes nothing more than a visit or telephone call from the FBI to cause the average witness to fear that if they do not tell a version of the events that squares with the what the government of United States of America wishes to hear (or not testify at all), they may find themselves the subjects of criminal investigations, arrests, audits, deportation or other retribution.

This court has before it a classic example of that fear and its repercussions. In USA v Wayne Myers, No. 3:02CR-174(SRU), a man named Faiez Rached worked in a store in Bridgeport. One night, an incident occurred at the store that resulted in the arrests of one Antonio Point and the above-referenced Mr. Myers. Mr. Rached agreed to testify for the defense in Mr. Point's state court trial, recounting the incident in a manner which flatly contradicted the professed eyewitness testimony of Bridgeport Police Officers. The

LAW OFFICES OF ROBERT SULLIVAN  190 Main Street  Westport, CT 06880  Tel. 227-1404  Juris No. 405837 Federal Bar No. CT08969

night before Mr. Rached was to take the witness stand, however, the Bridgeport Police arrested him on purported liquor sales violations, non-felonies which, at the discretion of the officers are as easily alternatively referred to the Liquor Control commission. A bail of $2,500 was set and Mr. Rached was held until he could make bail. As is explained below, the arrest effectively eliminated his availability as a witness. Yet, the charges against Mr. Rached were later nolled. Then, as the federal trial of Wayne Myers arising out of the same incident was approaching, Mr. Rached was approached by the investigator for Mr. Myers' federal public defender. Again, he agreed to make himself available to testify. He was then visited by four law enforcement officers, three of whom were the very Bridgeport police officers whose testimony he proposed to contradict. As the facts demonstrate, he was so frightened by their treatment of him that he began changing his testimony to avoid any additional problems with the police. As a hearing conducted by the Hon. Stefan R. Underhill on the tactics utilized by the government was wrapping up, the government moved to dismiss the case against Mr. Myers. In accepting the motion to dismiss, the court expressed its serious concerns about the manner in which Mr. Rached had been treated by law enforcement. The transcript of the hearing is submitted herewith as Exhibit A.

### REQUEST FOR JUDICIAL NOTICE OF TRANSCRIPT FILED IN DOCKET NO. 3:01CV-1073(SRU).

This date identical motions for protective order are filed in this action and in <u>United States of America V. Four Parcels of Property Located at 28-31 Bouton Street, Norwalk, Connecticut, with All Appurtenances and Improvements Thereon</u>. The Motion for Protective Order in that action includes, as an exhibit, an approximately 250-page transcript which is to be utilized in both motions.

LAW OFFICES OF ROBERT SULLIVAN  190 Main Street  Westport, CT 06880  Tel. 227-1404  Juris No. 405837 Federal Bar No. CT08969

In the interest in avoiding a needless waste of paper, undesigned counsel respectfully requests that the court in this matter take judicial notice of the transcript filed in that matter.

## ANALYSIS OF THE MYERS CASE

What follows is a factual analysis of the <u>Myers</u> case, with citations to the record. It is submitted to provide factual support for claimant Alqueen Burden's claims that 1) whether or not any particular law enforcement officer may intend to influence a witness through fear and intimidation, the mere status of law-enforcement officer unfairly creates that atmosphere and produces that influence; 2) abuses do exist; and 3) these factors create, in favor of the government, an enormous, unfair advantage over the government's opponent.

The page references entered below are to the transcript of the hearing, which took place on February 21, 2003 and February 24, 2003.

On June 25, 2000 an incident occurred at a grocery store in Bridgeport. (Page 12) which resulted in arrests by the Bridgeport Police of Antonio Point and Wayne Myers. It was alleged that upon being approached by the police, Messrs. Point and Myers ran into the market, being chased by the police. (Page 13). Mr. Point was accused of discarding a gun into a rack at the market. (Pages 13-14).

Messrs. Point and Myers were charged in state court. Mr. Point's public defender T.J. Paoletta (Page 11) sent Thomas Russell, the investigator for the public defender's office (Pages 9 and 11) to interview one Faiez Rached (Page 16) who either owned, managed or worked in the store. Before joining the public defender's office, Mr. Russell had been employed by the Bridgeport Police for 28 years, achieving the rank of detective. (Page 10). Mr. Rached, who was very apprehensive about the matter for fear of police retaliation, (Pages 16, 17 and 22) nevertheless agreed to speak with Mr. Russell, who

-5-

assured Mr. Faiez that he was not the police and that the police would not even be in the courtroom when he testified. (Page 17).  At Pages 28-30, Mr. Russell explains the difficulty of interviewing witnesses who fear police retaliation, describing some of the efforts that go into confirming for potential witnesses that defense investigators are not the police (e.g., the use of business cards, no guns, no badges).

Following the reassurances, Mr. Rached agreed to tell Mr. Russell what happened that day. (Page 22).  His report of the facts, in large substance, contradicted the allegations set forth by the police. (Page 54).  He agreed to testify and to accept a subpoena.(Pages 22, 49).

The Point matter commenced trial.  The defense was set to begin presenting its case on May 16, 2001.  As Mr. Paoletta sat at counsel table preparing to present his defense, Mr. Russell approached him, advising that Mr. Rached had been arrested the night before, that he was in the lockup , and that he would be unable to comply with subpoena. (Pages 23-26).  Mr. Paoletta's immediate belief was that the police had been pressuring him and that he had been arrested because they did not want him to testify (Page 74).

Mr. Rached's arrest was for non-felony alcohol violations.  The violations did not require an arrest. In the sole discretion of the officer Mr. Rached could either be arrested or reported to the State Liquor Authority.  In the past, he had always merely been referred to the State Liquor Authority. (Page 239).

In short, literally, hours before he was to take the stand to challenge the statements of the Bridgeport Police, the officers arrested him and took him into custody on non-violent, non-felony alcohol violations, jailing him until he could post a $2,500 bond.

Shortly thereafter, as Mr. Paoletta attempted to make arrangements to present another witness, he was conflicted out of the case because either he or his office had represented one of the other witnesses. (Pages 58-59). A mistrial was declared. (Page 40). Because of the conflict, the case was transferred to a special public defender (a lawyer outside the public defender's office) with the request that the case be promptly brought to trial. It languished, however, for another six months. Eventually, Mr. Point plead guilty to the charge, in exchange for an 18-month "time served" disposition. (Page 59).

Mr. Rached's alcohol case was nolled. (Page 142).

Later, the case against co-defendant Wayne Myers was transferred to Federal court (Page 200). His attorney was Federal Public Defender Allan Brenner. In late September, 2002, Mr. Brenner asked Darcy Beausoleil, the investigator assigned to his office, to contact make contact with Mr. Rached to inquire into his suitability as a witness, as had Mr. Russell in connection with the state case. Ms. Beausoleil made contact with Mr. Rached on October 8, 2002. At the time he was at Bridgeport Correctional Center. Page 158). She identified herself as an investigator with the Federal Public Defender. Mr. Rached was, nervous, concerned that she was from the INS. She, again, made clear that she was not from law enforcement. (Pages 160-161). After receiving those assurances, Mr. Rached stated that he was willing to discuss the case with her. He confirmed what he had told Mr. Russell, taking issue with the police version of what happened. (Pages 161-165). He was expected to be released from jail within the next few days, providing Ms. Beausoleil contact information for her following the release. (Page 165).

Ms Beausoleil did make contact with him at his store on or about October 21, 2002. This time, however, Mr. Rached told her that he had been contacted, in the meantime, by police who had come out to talk to him about the case. There were two

-7-

police officers, one detective and another man who he thought was the INS. He knew the detective was Detective Winkler. He was very nervous because somebody mentioned something about getting deported or INS and then there was some joking going on, which he did not find funny. He was quite concerned, feeling they were going to really start to harass him regarding his status as they asked him if he recalled what took place at the Market. He had just gotten out of jail and the last thing he wanted was to be back there. (Pages 166-170).

Despite all of this, Mr. Rached then, once again, agreed to accept a subpoena and testify in accordance with his recollections. The next day, however, he beeped Ms. Beausoleil, upset because he had, again, been visited by the detective. He, at that point was very concerned. On October 25, 2002, she and attorney Brenner went out to see Mr. Rached who, by that time, was "really, rally upset" because the FBI had come out to talk to him. He was extremely agitated, "really shaken up, pacing the floor. He was blatantly upset." He was changing his story and claiming that Mr. Myers had placed the gun in the rack, which didn't square with any version of events. He asked to speak to Mr. Brenner privately, which he did. When they returned, Mr. Brenner said "lets go" without serving the subpoena. Mr. Rached had told Mr. Brenner, in essence, that he was sorry about all of this and that Mr. Brenner should simply tell him what to say. (Pages 166-176).

At the hearing before Judge Underhill, Detective Winkler was evasive when asked, repeatedly, whether he was aware during the state trial of Mr. Point, that Det. Winkler's partner Officer Lamaine had arrested Mr. Rached just before he was scheduled to testify. (Page 198). Despite the evasiveness, it was established through Det. Winkler's testimony that it was he, Officers Jeremy DePietro and James DePietro (brothers), the very police witnesses who Mr. Rached intended to contradict, and an ATF Agent, who paid Mr.

- 8 -

Rached a visit at his apartment, joking about his immigration status and inquiring into whether or not he intended to be a defense witness (despite their having already been notified that he was a defense witness). (Pages 202, 211, 224). Indeed, the most recent contact Detective Winkler had had with Mr. Rached before that visit was to arrest and handcuff him, some 10 days earlier. (Pages 217, 220, 223). The officers also purported to offer to him help with respect to a burglary which had, apparently, occurred at his home. 227 He advised the agents that he had told the female (investigator) that he was not going to testify, because he did not see anything, (Page 229).

On January 15, 2003, Mr. Rached actually was arrested by the INS (Page 89). During his interview on the day of his arrest, he advised the INS that he was working with the FBI on a gun case (Page 99) and that his life would be in danger if he were returned to Syria. His father had been killed there; Mr. Rached, himself, had one eye, having something to do with the violence which he feared if he were to return (Page 96). Shortly thereafter, however, he reversed course, waiving all of his rights and agreeing to the deportation. (Pages 102-104). It appears that the deportation was stopped by the issuance of a material witness warrant issued for Mr. Rached. (Page 94).

On February 22, 2003, the Honorable Stefan R. Underhill commenced hearings inquiring into circumstances relating law enforcement's handling of this witness. As is demonstrated by Exhibit A, the above-described abuses were clearly established. As the hearing was about to conclude at the end of the day on Friday, February 21, 2003, it was agreed that the final questions to be put to the witness then on the stand would be deferred until the following Monday. When the parties arrived in court on Monday, February 24, 2003, however, rather than resuming the hearing, the government, claiming that there had been no impropriety, moved the court to dismiss the indictment. While the court granted the motion, it made the following observations:

... I can't endorse entirely the government's statement made in connection with the motion to dismiss. This is a case in which substantial evidence of inappropriate conduct by the government, meaning broadly the police, the Bridgeport Police and potentially others, has come to light and the government certainly has the right to interview defense witnesses but there is substantial law suggesting it can do so only upon notice to the defense that it's doing that and certainly, that notice wasn't provided. I think there are very serious – let me put it this way: I have serious concerns about the actions of the police officers in this case and I have at least some concerns about the matter, the way in which this matter was handled by the U.S. Attorney's Office and I think it's appropriate for me to expand upon those privately with the appropriate members of that office rather than to say anything on the record today. But – I haven't heard all the evidence that was necessary but there certainly is a serious question in my mind based upon what I've heard already whether Mr. Myers could obtain a fair trial of the charge in this case and, therefore, It think it's appropriate that it be dismissed. And It will express the hoe further that the state prosecution, which It understand was dismissed in favor of the federal prosecution, It recognize that the U.S. Attorney's Office has no control over that situation, and if the state chooses to, they can pick this matter back up and prosecute Mr. Myers on the state charge. I certainly hope that the U.S. Attorney's Office will do what it can to influence the state not to do that under all the circumstances. I'm going to grant the motion and dismiss the indictment.

Pages 8-10 of February 24, 2003 hearing)

I.  **THE USE BY THE GOVERNMENT OF CRIMINAL ENFORCEMENT AGENCIES TO INVESTIGATE WITNESSES OF ANOTHER LITIGANT VIOLATES THE EQUAL PROTECTION CLAUSE OF THE CONSTITUTION.**

The Fourteenth Amendment to the Federal Constitution provides that all persons born or naturalized in the United States and subject to the jurisdiction thereof are citizens of the United States and of the state wherein they reside, and that the states are forbidden to deny to any person within their jurisdiction the equal protection of the laws.[1]

---

[1] (Nebbia v. New York, 291 US 502, 78 L.Ed 940, 54 S.Ct 505, 89 ALR 1469; Plessy v. Ferguson, 163 US 537, 41 L.Ed. 256, 16 S.ct 1138 (disapproved on other grounds Brown v. Board of Education, 347 US 483, 98 L.Ed. 873, 74 S.ct 686, 53 Ohio Ops 326, 38 ALR 2d 1180, supp op 349 US 294, 99 L.Ed 1083, 75 S Ct 753, 57 Ohio Ops 253, 71 Ohio L Abs 584); McPherson v. Blacker, 146 US 1, 36 L.Ed 869, 13 S.Ct 3; United States v. Cruikshank, 92 US 542, 23 L.Ed 588; Minor v. Happersett, 88 US 162, 22 L.Ed 627; McErlan v. Taylor, 207 Ind. 240, 192 NE 260, 94, ALR 1284; State v.Martin, 193 Ind. 120, 139 NE 282, 26 ALR 1386; State v. Gibson, 36 Ind. 389. Mr. Justice Douglas' Contribution to the Law Equal Protection of the Laws, 74 Columbia L.Rev 357.

LAW OFFICES OF ROBERT SULLIVAN  190 Main Street  Westport, CT 06880  Tel. 227-1404  Juris No. 405837 Federal Bar No. CT08969

## II. THE EQUAL PROTECTION CLAUSE APPLIES TO THE FEDERAL GOVERNMENT AS WELL AS TO THE STATES.

The United States Supreme Court, by its application to congressional legislation of the same rules as to classification which are applied to determine the validity of state legislation under the equal protection clause of the Fourteenth Amendment[2] has indicated that it often tests the validity of federal legislation under the due process clause of the Fifth Amendment by the same rules of equality that are employed to test the validity of state legislation under the Fourteenth Amendment.[3]

While the Fifth Amendment contains no equal protection clause, it does forbid discrimination by the federal government that is so unjustifiable as to be violative of due process.[4] The federal sovereign, like the states, must govern impartially.[5] Thus, if a

---

2

(See for example, Knebel v. Hein, 429 US 288, 50 L.Ed 2d 485, 97 S.Ct 549; Jiminez v. Weinberger, 417 US 628, 41 L.Ed 2d 363, 94 S.ct 2496, later app (CA7 Ill) 523 F2d 689, cert den 427 US 912, L.Ed 2d 1204, 96 S.Ct 3200 and (disagreed with on other grounds Johnson v. Matthews, (CA8 Mo) 539 F2d 1111); NLRB v. Jones & Laughlin Steel Corp., 301 US 1, 81 L.Ed 893, 57 S.Ct 615, 108 ALR 1352; District of Columbia v. Brooke, 214 US 138, 53 L.Ed 941, 29 S.Ct 560)

3

(Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment. Delaware Tribal Business Committee v. Weeks, 430 US 73, 51 L.Ed 2d 173, 97 S.Ct 911, reh den 431 US 960, 53 L.Ed 2d 279, 97 S.Ct 2688 and reh den 431 US 960, 53 L.Ed 2d 279, 97 S.Ct 2688 and reh den 431 US 960, 53 L.Ed 2d 279, 97 S.Ct 2688; Buckley v. Valeco, 424 US 1, 96 S.Ct 612, 46 L.Ed 2d 659. The due process clause of the Fifth Amendment authorizes traditional equal protection analysis of federal rules, and therefore the clause has a substantive as well as a procedural aspect. Hampton v. Mow Sun Wong, 426 US 88, 48 L.Ed 2d 495, 96 S.Ct 1895, on remand (ND Cal) 435 F.Supp. 37.)

4

(Weinberger v. Weisenfeld, 420 US 636, 43 L.Ed 2d 514, 95 S.Ct 1225; Schlesinger v. Ballard, 419 US 498, 42 L.Ed 2d 610, 95 S.Ct 572, reh den 420 US 966, 43 L.Ed 2d 446, 95 S.Ct 1363; Johnson v. Robinson, 415 US 361, 39 L.Ed 2d 389, 94 S.Ct 1160; United States Dept. Of Agriculture v. Moreno, 413 US 528, 37 L.Ed 2d 782, 93 S.Ct 2821; Frontiero v. Richardson, 411 US 677, 36 L.Ed 2d 583, 93 S.Ct 1764; Shapiro v. Thompson, 394 US 618, 22 L.Ed 2d 600, 89 S.Ct 1322; Schneider v. Rusk, 377 US 163, 12 L.Ed 2d 218, 84 S.Ct 1187; Bolling v. Sharpe, 347 supp op 349 US 294, 99 L.Ed 1083, 75 S.Ct 753, 57 Ohio Ops 253, 71 Ohio L Abs 584; Hirabayashi v. United States, 320 US

-11-

classification would be invalid under the equal protection clause of the Fourteenth Amendment, it is also inconsistent with the due process requirement of the Fifth Amendment.[6]

---

81, 87 L.Ed 1774, 63 S.Ct 1374; Detroit Bank v. United States, 317 US 329, 87 L.Ed 304, 63 S.Ct 297; United States v. Craven, (CA6 Ohio) 478 F2d 1329, cert den 414 US 866, 39 L.Ed 2d 85, 94 S.Ct 54, reh den 414 US 1086, 38 L.Ed 2d 491, 94 S.Ct 606. The Fifth Amendment's due process clause encompasses equal protection principles. Mathews v. DeCastro, 429 US 181, 50 L.Ed 2d 389, 97 S.Ct 431. Fifth Amendment contains equal protection component prohibiting United States from invidiously discriminating between individuals of groups. Washington v. Davis, 426 US 229, 48 L.Ed 2d 597, 96 S.Ct 2040.)

[5]

(Hampton v. Mow Sun Wong, 416 US 88, 48 L.Ed 2d 495, 96 S.Ct 1895, on remand (ND Cal) 435 F.Supp. 37. The equal protection of the law guaranteed by the due process provisions of the Fifth Amendment is violated by a statutory scheme of the Social Security Act which, for the purpose of determining a child's eligibility for disability insurance benefits, divides illegitimate children born after the onset of disability to the wage earning parent into two divisions, one of which is deemed entitled to receive benefits without any showing of dependency upon the disabled parent, and the second of which is conclusively denied benefits, since (1) although the prevention of spurious claims is a legitimate governmental interest, nevertheless even if there is a greater possibility that evidence of parentage or support may be fabricated when the child is not born until after the wage earner has become entitled to benefits, it does not follow that a blanket and conclusive exclusion of one subclass of illegitimates is reasonably related to the prevention of spurious claims and assuming that the excluded illegitimates are in fact dependent on the disabled parent, it would not serve the purposes of the Act to conclusively deny them an opportunity to establish their dependency and their right to insurance benefits but would discriminate between the two subclasses of afterborn illegitimates without any basis for the distinction sine the potential of spurious claims is exactly the same as to both subclasses, and (2) if the illegitimates might rationally be classified on the basis of whether they are dependent upon their disabled parent, the Act's definition of the two subclasses of illegitimates is "over-inclusive" in that it benefits some children who are legitimated (42 USCS §402 (d)(3)(A)), or entitled to inherit (42 USCS §416(h)(2)(A), or illegitimate solely because of a defect in the marriage of their parents (42 USCS § 416(h)(2)(B)), but who are not dependent on their disabled parent and, conversely, the Act is "under-inclusive" in that it conclusively excludes some illegitimates who are, in fact, dependent upon their disabled parent. Jiminez v. Weinberger, 417 US 628, L.Ed 2d 363, 94 S.Ct 2496, later app (CA7 Ill) 523 F2d 689, cert den 427 US 912, 49 L.Ed 2d 1204, 96 S.Ct 3200 and (disagreed with on other grounds Johnson v. Mathews, (CA8 Mo) 539 F2d 1111)).

[6]

Johnson v. Robison, 415 US 361, 39 L.Ed 2d 389, 94 S.Ct 1106. Although equal protection of the law and due process are not always interchangeable, they can overlap, and discriminatory legislation may amount to a deprivation of due process, Dyer v. Abe,

-12-

LAW OFFICES OF ROBERT SULLIVAN  190 Main Street  Westport, CT 06880  Tel. 227-1404  Juris No. 405837  Federal Bar No. CT08969

### III. THE RIGHTS AFFORDED BY THE EQUAL PROTECTION CLAUSE APPLY TO LEGAL PROCEEDINGS.

Equal protection of the laws of a state is extended to persons within its jurisdiction, within the meaning of the Fourteenth Amendment to the Federal Constitution, when its courts are open to them on the same condition as to others in like circumstances, with like rules of evidence and modes of procedure, for the security of their persons and property, the prevention and redress of wrongs, and the enforcement of contracts.[7] The Supreme Court at an early date recognized the rule that an act of the legislature which in terms would give to one individual certain rights and the benefit of

---

(DC Hawaii) 138 F.Supp. 220, revd on other grounds (CA9 Hawaii) 256 F.2d 728.

[7] Traux v. Corrigan, 257 US 312, 66 L.Ed 254, 42 S.Ct 124, 27 ALR 375; Southern R. Co. V. Greene, 216 US 400, 54 L.Ed 586, 30 S.Ct 287; Connolly v. Union Sewer Pipe Co., 184 US 540, 46 L.Ed 679, 22 S.Ct 431 (ovrld on other grounds Tigner v. Texax, 310 US 141, 84 L.Ed 1124, 60 S.Ct 879, 130 ALR 1321, reh den 310 US 659 84 L.Ed 1422, 60 S.Ct 1092); Cotting v. Kansas City Stock Yards Co., 183 US 79, 46 L.Ed 92, 22 S.Ct 30; Bell's G.R. Co. v. Pennsylvania, 134 US 232, 33 L.Ed 892, 10 S. Ct 533; Marallis v. Chicago, 349 Ill 422, 182 NE 394, 83 ALR 1222; Jones v. Chicago R.I. & P.R. Co., 231 Ill 302, 83 NE 215; State v. Montgomery, 94 Me 192; 47 A 165; Universal Adjustment Corp. V. Midland Bank., Ltd, 281 Mass 303, 184 NE 152, 87 ALR 1407; Bogni v. Perrotti, 224 Mass 152, 112 NE 853; Opinions of Justices, 207 Mass 152, 112 NE 853; Templar v. Michigan State Board of Examiners of Barbers, 131 Mich 254, 90 NW 1058; State ex rel. Wells v. Walker, 326 Mo 1233, 34 SW2d 124 (ovrld on other grounds St. Louis v. Butler Co., 358 MO 1221, 219 SW2d 372, transf (Mo App) 223 SW2d 831); State v. Cudahy Packing Co., 33 Mont 179 82 P 833; State v. Shedroi, 75 Vt 277, 54 A 1081; Re Garrabad, 84 Wis 85, 54 NW 1104. Equal protection of the law implies that all litigants similarly situated may appeal to the courts for both relief and defense under like conditions, with like protection, and without discrimination. Sexton v. Barry, (CA6 Ohio) 233 F2d 220, 1 Ohio Ops 2d 231, 75 Ohio L.Abs 71, cert den 352 US 870, 1 L.Ed 2d 76, 77 S.Ct 94; Republic Pictures Corp. v Kappler, (CA8 Iowa) 151 F2d 543, 162 ALR 228, affd 327 US 757, 90 L.Ed 991, 66 S.Ct 523, reh den 3276 US 817, 90 L.Ed 1040, 66 S.Ct 804. It is an essential element of equal protection of the laws that each person shall possess the unhampered right to assert in the courts his rights, without discrimination, by the same process against those who wrong him as is open to every other person. The courts must be open to all upon the same terms. No obstacles can be thrown in the way of some which are not interposed in the paths of others. Bogni v. Perotti, 224 Mass 152, 112 NE 853. To the extent that the equal protection clause of the Fourteenth Amendment guarantees equal right of access to the courts, it affords safeguards to fundamental rights. State ex rel. Steeps v. Hanson, 274 Wis 544, 80 NW2d 812.

-13-

certain modes of procedure, and would deny to another similarly situated the same rights, could be challenged successfully on the ground of unjust discrimination and denial of the equal protection of the laws.[8]

### IV. BY CONGRESSIONAL ENACTMENT, EQUAL PROTECTION OF THE LAWS APPLIES TO LITIGANTS.

By federal statute (42 U.S.C. § 1981), all persons within the jurisdiction of the United States have the same right in every state and territory to sue, be parties, and give evidence.

That statute reads in its entirety as follows:

Equal rights under the law

(a) Statement of equal rights
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined
For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment
The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

---

[8] Backus v. Ft. Street Union Depot Co., 169 US 557, 42 L.Ed 853, 18 S.Ct 445. A legislature may not prescribe one rule for one suitor or class of suitors, and other for all others under like circumstances. Davidson v. Jennings, 27 Colo 187, 60 P 354. The legislature has no power to discriminate between persons or classes respecting the right to invoke the arbitration of the courts in the adjustment of their respective rights. Hocking Valley Coal Co. v. Rosser, 53 Ohio St 12, 41 NE 263. Statute which prevented landlord from bringing suit against tenant for damages to premises if landlord improperly treated security deposit imposed unreasonable and discriminatory class distinctions as between landlords requiring security deposits and those not requiring security deposits. Turner v. Lyon, 189 Colo 234, 539 P2d 1241. General as to procedure, see § 794, infra.

-14-

## V. IT IS A FEDERAL CRIME TO MAKE A FALSE STATEMENT TO A FEDERAL AGENT.

18 U.S.C. § 1001 makes it a federal offense to make a false statement to a federal agent. Undersigned counsel is aware of no such criminal sanction for making a false statement to an investigator for a non-governmental party. Even if there were such federal crime, non-government parties have no power to enforce the statute. Certainly such a private investigator would be hard pressed to convince the government to accuse a witness of lying when the witness is saying what the government wants to hear. Those factors, alone, create an intolerable inequality.

## VI. FRCP RULE 26(c) AUTHORIZES THE COURT TO CONTROL AND RESTRICT THE DISCOVERY IN THE MANNER HEREIN REQUESTED.

FRCP § 26(c) squarely authorizes the court to issue orders protecting claimant's witnesses from the intimidation, or fear of intimidation, created when law enforcement officers interview witnesses. The court may order that the discovery not be had, that it be conducted with no one present except persons designated by the court, or that the discovery only be had by a method designated by the court.

## CONCLUSION

Claimant Alqueen Burden respectfully requests, therefore, that the government be prohibited from utilizing law enforcement agents to interview or otherwise have contact with witnesses identified by Claimant Alqueen Burden. They should be restricted to the use of depositions, or if it appears appropriate by the court, to the use of private investigators with no power to arrest.

Respectfully submitted,
CLAIMANT ALQUEEN BURDEN

By_____
Robert J. Sullivan, Jr.
LAW OFFICES OF ROBERT SULLIVAN
190 Main Street
Westport, Connecticut 06880
Tel. No. 203/227-1404
Federal Bar No. CT08969

-16-

## CERTIFICATION

This is to certify that a copy hereof was mailed on October 16, 2003 to the following:

Henry K. Kopel, AUSA
Office of U.S. Attorney
157 Church Street, 23d Floor
New Haven, CT 6510

Julie G. Turbert, AUSA
Office of U.S. Attorney
157 Church Street, 23d Floor
New Haven, CT 06510

John P. Thygerson, Esq.
DePanfilis & Vallerie LLC
25 Belden Avenue
Norwalk, CT 06850

_____
Robert J. Sullivan, Jr.

LAW OFFICES OF ROBERT SULLIVAN  190 Main Street  Westport, CT 06880  Tel. 227-1404  Juris No. 405837  Federal Bar No. CT08969